## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **DAVID HAMILTON**, and **ELIZABETH HAMILTON**, | Case No. **06-60161-7** |
| Debtors. | |
| **DAVID HAMILTON**, | |
| Plaintiff. | |
| -vs- | |
| **US DEPARTMENT OF EDUCATION** and **NORTH CAROLINA STATE EDUCATION ASSISTANCE AUTHORITY**, | Adv No. **06-00076** |
| Defendants. | |

# MEMORANDUM  OF  DECISION

At Butte in said District this 5th day of March, 2007.

In this adversary proceeding the Plaintiff/Debtor David Hamilton ("David") seeks a

determination that excepting debt from three (3) educational loans in the approximate amount of

$32,154.62 from his discharge would impose an undue hardship on him under 11 U.S.C. §

523(a)(8).  Defendant North Carolina State Educational Assistance Authority ("NCSEAA")

opposes David's claim for relief.  After trial of this cause and review of the parties' briefs, the

1

record and applicable law, a separate Judgment will be entered in favor of the Plaintiff granting the relief sought, for the reasons set forth below.

This Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b). This is a core proceeding to determine dischargeability of a particular debt under 28 U.S.C. § 157(b)(2)(I). This Memorandum of Decision includes the Court's findings of fact and conclusions of law pursuant to F.R.B.P. 7052 (applying FED. R. CIV. P. 52 in adversary proceedings).

The proposed Final Pretrial Order was submitted by the parties and approved by Order entered on November 8, 2006, in which the Court directed that the Final Pretrial Order shall supercede the pleadings and govern the course of the trial. Trial of this cause was held after due notice at Missoula on November 17, 2006. The Plaintiff/Debtor David Hamilton ("David"), of Hamilton, Montana, appeared *in propria persona*[1] and testified, as did his spouse and co-Debtor Elizabeth Hamilton ("Elizabeth"). NCSEAA was represented at the hearing by attorney Harold V. Dye ("Dye"), of Missoula, Montana, and called vocational expert Kathleen Kleinkopf ("Kleinkopf") to testify regarding David's employability. Plaintiff's exhibits ("Ex."), 1 through 9, 12, 14, 16 through 31, 33 through 37, and Defendant's Ex. 1 through 29, were admitted into evidence by stipulation of the parties. At the conclusion of the trial the Court granted the parties time to file simultaneous briefs, which have been submitted and reviewed by the Court together with the record and applicable law. This matter is ready for decision.

The approved Final Pretrial Order set forth the following agreed facts:

---

[1] While David appeared pro se and represented himself at trial, he admits that his spouse Elizabeth helped him research and prepared his complaint, pleadings and trial notebook, with his participation and discussion. Defendant's Ex. 5, Transcript of David's deposition, pp. 9-10.

(a) David and his spouse Elizabeth filed jointly a voluntary Chapter 7 bankruptcy petition on March 28, 2006.

(b) David filed separately an adversary proceeding complaint on June 8, 2006, seeking to determine the dischargeability of three (3) North Carolina PLUS loans (NC PLUS loans).

(c) NCSEAA is the holder of the three PLUS loans in the approximate amount of $31,998 as listed on the Debtors' Schedule E.

(d) NCSEAA maintains a mailing address regarding these loans at 10 T.W. Alexander Drive, PO Box 14002, Research Triangle Park, NC 22709.

(e) Jurisdiction exists under 28 U.S.C. § 1334. Venue is proper under 28 U.S.C. § 1409(a). The District Court has generally referred these matters to the Bankruptcy Court for hearing pursuant to 28 U.S.C. § 157(b)(2)(I). This adversary complaint is brought pursuant to 11 U.S.C. § 523(a)(8).

(f) Plaintiff is indebted to NCSEAA in the approximate amount of $32,154.62 together with accruing interest, fees, and costs as provided in the loan documents.

The testimony and exhibits set forth extensive additional facts regarding David's history of employment and loan repayment, health problems, and circumstances leading up to Debtors' bankruptcy. David is 65 years old. He and Elizabeth have been married more than 45 years and have 2 grown children. Both David and Elizabeth are now retired and living on social security. David testified that he suffers from coronary heart disease and underwent quadruple bypass surgery in March of 2000. Elizabeth testified that David had an attack of chest pains when he was 44 years old while playing tennis with his son, and they later learned that he had a silent

3

heart attack[2].

David received a B.A. degree in 1964, which included a single semester of accounting. He testified that he has had no further formal education, but underwent one year of missionary training after college, after which he and Elizabeth moved to Japan where they lived and worked as missionaries for 11 years. Elizabeth testified that her college training was as a teacher, that since 1962 she has taught in every age group and been an administrator and school principal. Elizabeth hired David to work as a teacher in two Christian schools she ran while they lived in Japan, because she knew he loved children and would ask her if he needed help.

David testified that when they returned to the United States from Japan he was in his mid-30's without any skills except for fluency in the Japanese language, and he never recovered financially or professionally from the 12 years he spent as a missionary. His first job after returning from Japan in 1976 was as a telephone customer service representative with the Bank of Japan in New York City for a year, which he quit because he did not earn enough income to support his family. Defendant's Ex. 5, pp. 14-16. David testified that he is not a certified public accountant ("CPA"), but that he has used the term "accountant" as a job description on his resume even though he requires considerable support to perform accounting. Defendant's Ex. 1 at pages 4 and 5 set forth David's employment history working in jobs ranging from hospital cleaner to business counselor, Amway sales representative, door-to-door vacuum cleaner salesman, bookkeeper/accounting, and a teaching position in a church school in New Zealand. Ex. 36 also sets forth his employment history since August 1988, which is discussed in detail

_____

[2]She related an earlier anecdote from July 4, 1985, when David became too exhausted to continue walking to a fireworks display.

4

below.

In 1978 David's father purchased for him a franchise with General Business Services ("GBS"), a franchise providing record keeping services. Defendant's Ex. 5, pp. 18-19. David opened his GBS franchise in Oahu, Hawaii, where he lived for 4 years. Defendant's Ex. 5, p. 19. David could not keep up with the GBS franchise payments and was not permitted to continue running his own franchise. Defendant's Ex. 5, pp. 20-22. David worked for another GBS franchisee in North Carolina for about 1 year, and later returned to Hawaii where he was employed by a different GBS franchisee in 1992 and 1993. Defendant's Ex. 5, pp. 20-21, 25; Plaintiff's Ex. 36.

In 1987 David and Elizabeth discovered the existence of David's coronary heart disease. Elizabeth testified that they discovered severe blockage and she wanted David to follow his doctor's recommendation to undergo immediate heart bypass surgery, but David decided to undertake medication therapy instead of surgery because they did not have the money for surgery. David was urged by his doctors four separate times from 1987 to 2000 to have bypass surgery.

In 1988 David testified that he worked for Directional Media Associates, a company involved in touch screen advertising, where he was responsible for record keeping in its financial department. Defendant's Ex. 5, pp. 26-28. Directional Media Associates went out of business in 1989. David testified that he was never fired, but the IRS padlocked Directional Media Associates' business for failure to pay withholding, throwing him out of that job.

While David was employed with Directional Media Associates in 1988 and 1989 he signed, as parent borrower, three loan applications for NC PLUS student loans for his two children. Defendant's Ex. 5, p. 32. David testified that he originally believed he was only a co-

5

signor of the NC PLUS student loans for his children and that they were receiving regular monthly bills for the loans, but he admits now that he is the borrower as he learned when reviewing the applications in preparation for this adversary proceeding. He claims his belief was strongly reinforced by Defendant's Ex. 14, a demand letter from the North Carolina attorney general dated June 18, 1991, demanding payment which referred to David's application for a student loan "[w]hile in school".

Plaintiff's Ex. 16, 17, 18 are the NC PLUS loan applications, and set out repayment schedules beginning the first year and ending in 1998. David signed the promissory note section B of all three loan applications as parent/borrower. He testified that the repayment periods under the terms of the three loans all have expired, and he was not instructed by the lender of any change in the original repayment terms.

Plaintiff's Ex. 16 is the NC PLUS loan application David signed for his daughter Debbie in the amount of $4,000, dated August 8, 1988. At line 21 David entered his adjusted gross income ("AGI") in the amount of $47,425. David testified in his deposition that he was not being paid nearly that amount by Directional Media Associates, but that he and Elizabeth had started an Amway business[3] a few years before to try to supplement income and took the AGI on Plaintiff's Ex. 16 off of their combined tax return. Defendant's Ex. 5, pp. 30, 32-33.

Plaintiff's Ex. 17 is the NC PLUS loan application for son Mark for $4,000 dated August 3, 1988, on which David entered an AGI of $59,023 at line 21. Plaintiff's Ex. 18 is a second loan for Mark in the amount of $4,000 dated August 24, 1989, on which David entered an AGI of

---

[3]The Amway business continued for approximately 7 years, until 1992. Defendant's Ex. 5, p. 32; Plaintiff's Ex. 36.

$50,938 at line 21.

David testified that, although he believed he was only a co-signor under the three student loans, he made payments to NCSEAA for 3 years, approximately $1,100 during the first year in 1989 and $1,267.00 from 4/2/2004 through 3/28/2006. Defendant's Ex. 5, p. 72. Plaintiff's Ex. 20 and 21 corroborate David's testimony that he has made several payments on his NC PLUS loans totaling $2,367.00, an amount he claims is approximately 20% of the total original principal. David testified that after he paid $1,100 the first year in 1989 he lost his job and could no longer make payments.

Plaintiff's Ex. 36 sets out David's work history from 8/88 through 3/06, and confirms he lost his lob in September of 1989. In fact, Ex. 36 shows that except for David's employment during 1988 to 1989, a period of 13 months during which he paid regularly, most of David's periods of employment lasted less than 12 months.

In 1990 David found employment by the Lausanne Committee for World Evangelization, where he worked in finance and computer data entry for only about 6 months before it closed. Defendant's Ex. 5, pp. 35-36. After that David returned to work for approximately 1 year at a GBS franchise in Hawaii in October of 1992, working as a consultant with clients who performed their own record keeping. Defendant's Ex. 5, pp. 36; Plaintiff's Ex. 37-38. That job ended when the franchisee decided to retire and wound up the business.

David's next job was with the finance department of another religious organization, International Students, Inc., where he was responsible for payroll data entry. Defendant's Ex. 5, pp. 39-40. David worked there only a few months, but he testified that he had to resign when he began having chest pains and tried to find less stressful work.

7

David next went to work for Magnetic Engineering, Inc. ("Magnetic Engineering") near Colorado Springs, in October 1994 performing financial work in accounts receivable, accounts payable and payroll. Defendant's Ex. 5, pp. 40-41; Plaintiff's Ex. 36. David was the sole employee working on finance and accounting for Magnetic Engineering, although it also used an outside accountant. Defendant's Ex. 5, pp. 41, 44. David testified that he also began selling books written by Elizabeth during this period, and they lived a frugal life style and slept on the floor using a folding foam mat as a cushion. Magnetic Engineering moved the company operations to Costa Rica in March 1996 and David was once again unemployed.

David's employment with Directional Media Associates, Magnetic Engineering, and with PhotoCard from March 1999 to March 2000, were the only periods of employment which exceeded 12 months shown on Plaintiff's Ex. 36. His employment by Jaqua Girls from August 2000 to July 2001 almost lasted one year, but his other periods of employment from 1990 through the present lasted only a period of months, not years.

Correspondence between David and student loan creditors in the record is extensive during his periods of employment and unemployment. Defendant's Ex. 6, 7, 8, 9, 10, 11, 12, 13 are correspondence between David and student loan creditors, beginning with College Foundation Inc., in 1990, demanding repayment of student loans. Defendant's Ex. 7offered to accept a resumption of payments in 1990. Defendant's Ex. 8 and 9 repeat demands for payment. Defendant's Ex. 10 dated December 4, 1990, is a letter and collection worksheet from NCSEAA which had acquired David's loans, and offers to reinstate the loans in return for a payment/forbearance fee of $2,200. David testified that he was unemployed in 1991 with no income at all, and receiving his necessities from family friends and his church, and that he called

8

NCSEAA to inform it of these facts, as shown by page 2 of Defendant's Ex. 10.

Defendant's Ex. 11 dated January 1991 discusses NCSEAA's collection options and offers repayment alternatives. Defendant's Ex. 12 dated April 3, 1991, repeats the default and NCSEAA's collection options. Defendant's Ex. 13 dated May 20, 1991, demands immediate repayment or for David to get in touch with them immediately. Defendant's Ex. 14 dated June 18, 1991, is from the North Carolina Department of Justice demanding payment in full or a payment of $170, at a time when David testified he was still unemployed except for Amway. David testified that he sold his possessions and slept on a mat on the floor. Both of David's children dropped out of college and they had to borrow money from their relatives.

Defendant's Ex. 26 is a copy of the complaint against David filed in state court in North Carolina to recover the student loan debt in the amount of $11,630.74, dated July 26, 1991. David admitted that he was served with the complaint, but his children were not named. The North Carolina Department of Justice sent David Defendant's Ex. 15 dated March 13, 1992, advising that it had obtained a civil judgment against him for the full amount of the defaulted student loans, and threatening execution or wage garnishment. David testified that the judgment was never collected, which he believes shows both his lack of assets subject to execution and employment to pay the judgment. He testified that he was unemployed at the time the judgment was entered except for his Amway work, which he stopped in the Summer of 1992.

Defendant's Ex. 16 dated September 23, 1992, is from NCSEAA advising David of an offset against his federal tax refund to collect the loans totaling $14,229.75. David testified that he and Elizabeth had moved to Hawaii where he worked for the GBS franchise until July 1993 when the franchisee retired and closed the franchise. They returned to Colorado in July 1994

9

where David found work in Colorado Springs with International Students, but that lasted only 2 months.

Defendant's Ex. 17 dated February 22, 1993, is a notice to David from NCSEAA advising that the defaulted student loan was assigned to Financial Collection Agencies. David testified that Defendant's Ex. 17 was sent to the wrong address. Defendant's Ex. 18 dated April 14, 1994, is from NCSEAA to David, sent to the same wrong address, advising that the defaulted loans were sent back to NCSEAA provided David contact it to arrange repayment. David testified that he did not receive Defendant's Ex. 17 or 18.

In 1997, David testified, he and Elizabeth went to New Zealand in 1997 to scout business opportunities for Magnetic Engineering, but his employer left them stranded when it did not send them promised funds[4]. Defendant's Ex. 5, p. 45. David sought employment in New Zealand, but he testified that accounting practices were different there and he could not find work in accounting. He testified that they spent all of an inheritance they had received on necessities, after which they lived on gifts from New Zealanders.

Elizabeth took a teaching position, where David also found employment, teaching children aged 5 to 9 at a Christian school called Homeleigh School from January through December 1997. Defendant's Ex. 5, p. 45. Both David and Elizabeth taught, but because of the high rate of taxation in New Zealand (20%), he testified that they could not even afford to purchase clothing.

David testified that they resigned from their teaching positions at Homeleigh School due

---

[4]David and Elizabeth went to New Zealand with fully paid round trip airline tickets, which they used to return eventually to the United States.

to their religious beliefs, when they were unwilling to join the sponsoring church. Defendant's Ex. 5, p. 47. Elizabeth found employment as principal at another Christian School in New Zealand, Reikorangi School, and she was able to hire David and they both taught there from December 1997 to April 1998. Defendant's Ex. 5, p. 47; Ex. 36. He testified that the school ran out of money and could not pay their salaries, so they resigned in April 1998 and he remained unemployed until September 1998.

David testified that they established permanent residency in New Zealand, but they could not find work. They sold their car and furniture and most of their possessions at a garage sale in New Zealand, and returned to Los Angeles, California, using their return tickets in July of 1998.

During this period Plaintiff's Ex. 22, 23, and 24 show regular reviews and collection worksheets by NCSEAA regarding David's employment and ability to pay, dated 1991, 1995, and 1996. David testified that the regular reviews show that he did not have funds to repay even through he had high hopes and worked hard for 18 years to maximize his income and minimize his expenses. Defendant's Ex. 19, 20, 21 and 22 are additional correspondence from NCSEAA to David from 1995 to 1998 regarding demand and collection of his student loans. Defendant's Ex. 22, a letter to David dated January 27, 1998, discusses changes to his repayment terms applying any payments first to outstanding fees and interest and then to principal, but David testified that it was sent to the wrong address and he never received it. He admitted under cross examination receiving several of the 17 letters sent to him by NCSEAA.

David testified that they moved from Los Angeles to Santa Barbara where they found a church they liked. David found a temporary position with a computer graphic arts business, In Color, Inc., ("In Color") in September 1998 where he worked in finance, accounts receivable,

11

accounts payable and timekeeping using the computer. Defendant's Ex. 5, p. 48-50. In Color was bought out and David began looking for other employment, which he found at PhotoCard, Inc. ("PhotoCard") in March 1999. Ex. 36. At Photocard David again worked at in-house accounting and bookkeeping on a computer. Defendant's Ex. 5, p. 52.

David testified that they could not afford to rent a condominium they had found, and had to move to an RV park where they lived in a twenty foot long motorhome[5], and David also served as a camp host. He testified that PhotoCard paid him between $30,000 and $40,000 for the year he was employed there. Defendant's Ex. 5, p. 53; Ex. 36. PhotoCard decided to move its location nearer to Los Angeles and invited David to come along, but there was no RV Park near the new location, and without employment they could no longer afford to stay near Santa Barbara.

While employed at PhotoCard David underwent quadruple heart bypass surgery. Defendant's Ex. 5, p. 53; Plaintiff's Ex. 9. David testified that Elizabeth worked for the first three months of 2000 but stopped working after March to care for David after his open heart surgery. Debtors earned $42,000 in income that year, Defendant's Ex. 23, but David testified that they had to pay for increased commuting and cover their health insurance deductible.

After David recuperated for 4 months he found employment with a cosmetic product distributor, Jaqua Girls, Inc. ("Jaqua Girls") performing the same computerized[6] financial tasks as his prior employment. Defendant's Ex. 5, pp. 53-54. Jaqua Girls was purchased by a venture

---

[5]Ex. 35 is a photograph of the motorhome.

[6]Unlike his previous employment, David was able to identify the computer software he used at Jaqua Girls as Quickbooks, which they later changed. Defendant's Ex. 5, p. 55.

12

capital firm, and David left the company in 2001 when he saw the purchaser install its own employees, including in the area of finance. Defendant's Ex. 5, p. 56; Ex. 36. Defendant's Ex. 23 is Debtors' 2001 federal and California income tax returns, showing a $260 state refund but $102 federal tax owing. David could not recall how that net refund was used. David testified that he has been unemployed for five years, although not by choice, and last worked in July of 2001.

They next moved to Arizona, where David testified they lived in a trailer park while he searched for employment and Elizabeth wrote books at home. David testified that he searched for employment in Arizona diligently, answering classified ads and sending out resumes, but could not find employment. David and Elizabeth's 2002 tax returns show they earned a combined $7,000 in income. Defendant's Ex. 24.

David applied for and began receiving early retirement social security payments at age 62, in June of 2003 while living in Arizona. Defendant's Ex. 5, pp. 57-58. He did not apply for social security disability benefits and did not mention any disabilities in his application. Defendant's Ex. 5, pp. 57-58. Defendant's Ex. 25 are Debtors' 2003 tax returns[7]. Ex. 25 shows that Elizabeth drew a $15,000 salary, which David testified was from their corporation Quiet Impact, Inc., and was most of the income they had that year.

David testified that the $1,267 in student loan payments made beginning in 2004 were made by offsets, which he contends he voluntarily allowed to be offset from his social security benefits by not availing himself of his appeal rights or other offered remedies. Defendant's Ex. 21 is a letter from NCSEAA dated September 12, 1997, which informed David that student loans

[7]David testified that he has not retained tax returns for the years prior to 2000.

13

would be collected by offset against federal payments, and David's rights and manner in which he must exercise them to avoid offset.

NCSEAA sent David Plaintiff's Ex. 25, a letter dated July 8, 2003, which begins: "You have continued to ignore your obligation to repay your student loan debt." NCSEAA accused David of showing little willingness to assist NCSEAA, and stated: "You might be surprised with the arrangements that we may be able to work out." In his testimony David denied ignoring his obligation, and reiterated that he was unable to pay NCSEAA anything. David sent NCSEAA Plaintiff's Ex. 26, a letter dated 7/22/03 in response to NCSEAA's letter to him, explaining that he is unemployed and on social security, has no assets and cannot repay the loans. David requested NSCEAA give him consideration for a hardship case, and asked NCSEAA for help. NCSEAA replied by sending David Plaintiff's Ex. 27, an invoice for $274 dated 7/31/2003 showing a total PLUS loan balance in the amount of $29,294.58. On August 20, 2003, NCSEAA sent David Plaintiff's Ex. 30, dated August 20, 2003, a questionnaire to update his status. David checked the space next to the statements on Plaintiff's Ex. 30 that he was currently unemployed and did not have the current ability to pay anything on this debt.

David testified that he was frustrated, and in Plaintiff's Ex. 28 dated August 25, 2003, he repeated his question whether there is ever any consideration given for hardship cases, and offered to commit up to $12,000 by borrowing or working over a period of 5 years if NCSEAA would waive the rest of the nearly $30,000 obligation. David closed Ex. 28 by stating he is "willing to cooperate to my greatest ability" if NCSEAA was willing to compromise. NCSEAA responded to Plaintiff's Ex. 28 with Plaintiff's Ex. 29, dated September 2, 2003, in which NCSEAA advises David that federal guidelines limit its ability to accept compromises on

14

defaulted accounts to lump sum payments rather than installments over time.  NCSEAA offered to consider a lump-sum compromise settlement.

Debtors moved to Montana in August of 2003 and live in a rental unit in a tri-plex in Hamilton.  Plaintiff's Ex. 1.  David testified that he learned after he moved to Montana that his children had not been repaying the student loans, but still thought in 2003 that he was just a guarantor.  David has not sought employment in Montana because of his lack of success after applying for dozens of jobs in Arizona.  Defendant's Ex. 5, p. 60.

David testified that he still suffers from coronary heart disease after his surgery, and he takes medication daily for his heart disease.  Plaintiff's Ex. 9 include extensive medical records for David from the Bitterroot Clinic, St. Patrick Hospital and Health Sciences Center and a clinic in Santa Barbara, setting forth his medical history and treatment since 1998.  The most recent medical records from 2006 in Plaintiff's Ex. 9 show that David continues to be diagnosed with coronary artery disease "with perhaps some degree of residual coronary insufficiency and definite neglect of secondary coronary prevention factors" .  Ex. 9 also notes David suffers from suspected diverticulitis, chest tightness when under stress, hypertension which is inadequately controlled, "progressive effort angina" which occurs frequently in settings of emotional stress or walking up stairs, continued mild high blood pressure, hyperlipidemia, numbness in his left side and left leg while standing.  On 6/6/2006, the examining physician wrote:  "I feel he is at significant risk for prostate cancer".  Plaintiff's Ex. 9.  A Dr. Wilson wrote his impression on 6/15/2006 regarding David's coronary artery disease and progressive angina:  "New disease or graft failure suspect."  Plaintiff's Ex. 9.

After David applied for social security benefits in June of 2003, Elizabeth applied for

15

social security in March of 2004. Plaintiff's Ex.5 shows David's monthly social security benefit in the amount of $842, and Elizabeth's monthly benefit is $464. David testified that their combined from social security in $1,306 or $15,672 per year, which is their only source of income. He testified that the poverty limit for annual income established by the United States Department of Health and Human Services ("HSS") is $13,200[8], and that their income is $2,472 above the poverty guideline.

Plaintiff's Ex. 31 includes two letters from the U.S. Department of the Treasury ("DOT") dated 1/28/04 and March 4, 2004, the first advising David that DOT would offset up to 15% of his monthly social security benefits to pay his student loan debt beginning March 2004, but not below $750. The second letter responded to David's inquiry about the possible offset of his student loan debt against federal payment and advised him to contact the creditor. David's inquiry to DOT referenced in Plaintiff's Ex. 31 was dated February 2004, Plaintiff's Ex. 33, in which he requested the DOT to refrain from offsetting the student loans against his social security until he paid off the IRS for overdue taxes owed in 1999 which were being paid to the IRS at the rate of $300 per month from his social security payments. Under cross examination David testified that the IRS was offsetting approximately $11,000 against his social security payments, a debt he described as consisting of insufficient withholding from income in 1999, plus penalties and interest. Counsel for NCSEAA questioned David about his failure to locate his 1999 tax returns, but David testified that he produced all the tax returns which he was

---

[8] The established guideline value existing at the time of trial in 2006.

16

requested to produce[9], and does not have tax returns for years prior to 2000. Notwithstanding his request, David testified that offsets against his social security benefits began to be made on April 2, 2004, and that in 23 months his benefits were offset by a total of approximately $1,367, all of which was applied to accrued interest and fees with nothing paid to reduce the principal on the NC PLUS loans. He testified that the DOT advised him of his options to stop the offsets, but that each month he voluntarily acquiesced to the offset and did not exercise his rights, in order to make payments on his student loan debt. Plaintiff's Ex. 7 is a press release from the social security online service announcing a 3.3 percent (3.3%) cost of living adjustment ("COLA") beginning in January 2007. Plaintiff's Ex. 8 is an HHS fact sheet dated September 12, 2006, announcing a 5.6% increase in Medicare Part B premiums in 2007.

While in California David and Elizabeth formed two subchapter C corporations in Nevada which were identified as Bottom Line Impact, Inc. ("Bottom Line Impact") and Quiet Impact, Inc. ("Quiet Impact"). Defendant's Ex. 5, p. 77. David testified that both he and Elizabeth have worked at the corporations for 5 years, but that neither corporation currently produces any salary or income for them and neither corporation is liable for David's NC PLUS student loans. David testified that Quiet Impact is a subsidiary of Bottom Line Impact, which owns 90% of its shares, with David and Elizabeth owning the other 10%. David and Elizabeth are the sole shareholders of Bottom Line Impact. On cross examination David testified that he has made no effort to seek employment since starting the corporations because he and Elizabeth

---

[9]The case docket shows David is correct. NCSEAA requested production and filed a motion compel production of 2 years of corporate tax returns, which was withdrawn in part and denied in part by Order entered on November 13, 2006. Docket Nos. 36, 48, 72. The record does not show that NCSEAA requested or moved to compel production of any of the Debtors' other tax returns.

decided to devote their time to the two corporations, which have no employees, in the hope of succeeding.

Quiet Impact is in the business of publishing character building, development and education books for children. Defendant's Ex. 5, p. 79. Bottom Line Impact was formed to provide bookkeeping and record keeping services related to finance, and to develop income from internet marketing. Defendant's Ex. 5, pp. 80, 82-83[10], 85. David testified that he spends an average of 6 hours per day five days per week working on the corporations. Defendant's Ex. 5, p. 62. He testified that not all of that time is productive time, but he spends most of the day on the computer trying to learn things that might increase their income. Defendant's Ex. 5, pp. 63-64.

The corporate assets of Bottom Line Impact and Quiet Impact are minimal, consisting mostly of office furniture and a lease interests in computers which is also an obligation. Defendant's Ex. 5, p. 81. David testified that three of Quiet Impact's most popular books are out of print, and the fourth is about to go out of print. He testified that the corporations' expenses are increasing and far outweigh any increase in income, and that any profits they might make would be plowed back into the corporation.

Defendant's Ex. 28A and 28B are sealed consolidated corporate tax returns for Bottom Line Impact and Quiet Impact, for the years 2004 and 2005, respectively. Defendant's Ex. 5, p. 78. David testified that he prepared the returns and signed them without any help. He testified

---

[10]David's internet marketing is still only a goal. He attempted to create a website to develop internet marketing and continues to try to learn it, but only managed to build a website, "Character-in-Action.com" using Dream Weaver software with help from his son, and that website is not currently operational. Defendant's Ex. 5, pp. 82-83. Defendant's Ex. 27 are screen shots from the website.

that Bottomline earned $14,314 in taxable income in 2004 and $5,260.68 in taxable income in 2005 before operating losses, but Defendant's Ex. 28A and 28B show that no tax was due for either tax year after net operating losses were deducted.

David denied Defendant's suggestion that he is hiding income from the corporations, and testified that Ex. 28B shows a loss of -$15,515.93 in retained earnings for 2005. Defendant's Ex. 28B, p. 4. David testified that they included a home office deduction and debited rents on their corporate returns, but that the corporate funds were not taken out and paid for rents.

Under cross examination David testified that current assets for Bottom Line Impact on line 6, page 4 of Defendant's Ex. 28A and 28B increased from $42,338.39 to $60,906.25, and then to $76,401.25, while line 19 shows loans from shareholders reduced from $27,262.91 to $11,162.67 by repayment[11]. David testified that the loans from shareholders were not completely repaid at any time.

David testified that most of the 2004 corporate income for Quiet Impact resulted from a one-time order from North Carolina for books for $14,000, and that they did not receive another such order before or since. David described a corporate marketing effort they undertook in 2006 which consumed several hours of time but was not successful, and he testified that they could not repeat such an effort. Bottom Line Impact has only a single client, Jaqua Girls, which he testified is looking to hire in-house employees instead of outside employees. Defendant's Ex. 5, p. 85.

David testified that the 2 corporations have no assets to pay for his student loans, and that if the corporate assets were sold the proceeds would have to pay for the corporate credit card debt

---

[11]Part of the repayment was a book entry for automobile deduction, which David testified was treated as a debit to expenses and a credit against loans from shareholder for the portion of their personal automobile which was used for corporate business.

19

to American Express or the corporations would have to file for bankruptcy, which would be to Elizabeth's detriment since she is sole guarantor of the corporate debt[12] owed to American Express by Quiet Impact and she already has received a discharge in the above-captioned Chapter 7 case[13].

Plaintiff's Ex. 3 is a credit card statement from Chase for an account in Elizabeth's name showing a balance owing of $3,752.34 dated in March of 2006, which David testified was her credit alone. Plaintiff's Ex. 4 is a check from Banc One Management Corp. made out to Elizabeth in the amount of $4,471.90 dated August 14, 2006, in settlement of litigation during the pendency of Debtors' Chapter 7 case. David testified that the litigation settlement amount was made out to Elizabeth and did not include him, and that although he was included in the judgment entered in the litigation none of that money was his. Elizabeth testified that she used the proceeds to purchase some household cleaning supplies, repair and pay off their car, and gave their children some money to pay their rent.

David explained that he and Elizabeth used their credit cards to keep themselves and the corporations afloat, but got into trouble and had to file their Chapter 7 petition. Defendant's Ex. 5, p. 84. He testified that they tried to avoid bankruptcy, but they filed a Chapter 7 petition, pro se, including their Schedules and Statements on March 28, 2006. David testified that he used on online bankruptcy form service, "Bridgeport Bankruptcy", to draft his bankruptcy forms. The

---

[12]David testified that Bottom Line Impact has no liabilities. Defendant's Ex. 5, p. 81.

[13]Discharge was entered in the Debtors' Chapter 7 case on July 12, 2006. American Express was not listed in the Schedules and was not sent a Notice of Commencement, Docket No. 6/7. David testified that the American Express account was not a personal account. Defendant's Ex. 5, p. 81.

20

online service allowed him to input information, and generated .pdf forms, without permitting him to ask questions. He testified that Elizabeth had no role in preparing their Chapter 7 petition, Schedules and Statement of Financial Affairs.

Debtors applied for and were granted waiver of the filing fee by Order entered March 29, 2006, after representing that their expenses exceeded their income and otherwise met the requirements to receive a fee waiver.

David testified that his student loan debt comprises approximately 27% of their debts. Under cross examination David admitted that he did not list his children as co-debtors of the student loan debt.[14] He testified that they own no real property to list on their Schedule A, and that their furniture and car listed on Schedule B are jointly owned and not worth much. The Bottom Line Impact and Quiet Impact stock are listed on Schedule B as jointly owned and a current value of $1 each[15], but David testified that the corporations have a negative net worth. David testified that the shareholder loans to Bottom Line Impact are not listed as an asset on Schedule B. The case docket for Debtors' Chapter 7 case does not reflect any objection to discharge or other enforcement action instituted by the Trustee, Office of U.S. Trustee, or other party.

David testified Debtors have no jewelry except their wedding bands, no inheritance[16] or

---

[14]The three loan applications, Plaintiff's Ex. 16, 17, and 18, all have David's signature in the promissory note section B, but not his children's signature. NCSEAA failed to show that his children in fact are liable for the student loans.

[15]Defendant's Ex. 28A and 28B both list the common stock of Bottom Line Impact at a book value of $20,000, at line 22 of page 4.

[16]An inheritance they received was consumed by their expenses, he testified.

21

retirement or other assets which they could liquidate to repay David's NC PLUS student loans. Debtors did not list the Quiet Impact corporate American Express debt on their Schedules because, David testified, it was not listed on their credit report as a personal debt and he did not think it was important.

Schedule I lists their combined monthly income exclusively from social security in the amount of $1,306. Schedule J lists their monthly expenses at a total amount of $1,634. David testified that they try to minimize their expenses, and that certain expenses have changed since the petition. Their monthly rent of an unit in a triplex in Hamilton is the least expensive they can find, he testified.

David testified that they budgeted $50 per month for clothing, but that amount is seldom actually spent on clothing. Their medical and dental expenses are scheduled at $50, but David testified that amount is not sufficient and does not pay for dental or vision care, or for deductibles. Their $25 monthly budgeted entertainment, David testified, usually goes to transportation and they never rent movies or go out for entertainment. He testified that their expenses include nothing for prescription costs, medical insurance, dental, vision, tires or vehicle repairs, renters insurance, life insurance, retirement, replacement of towels and bedding, or snow removal. He testified that their clothes are wearing out, his shoes have holes in the bottoms and neither of them has a winter coat.

David testified that their monthly expenses changed since they filed their Schedules. They paid off their car loan and no longer pay a $300 installment payment on their car, a 2001 Nissan Sentra. Plaintiff's Ex. 1. David testified that their car is no longer under warranty and they will have to pay for future repairs. Debtors pay an additional $88.50 for supplemental

medical insurance under Medicare which is deducted from David's social security check. Plaintiff's Ex. 6. Plaintiff's Ex. 14 is a letter from Humana Prescription Drug Plan, which David testified shows a 348.3% increase in his monthly premium beginning in January 2007[17]. David testified that Debtors' current monthly expenses total $1,432 or $17,814, leaving them a monthly $126 deficit of expenses exceeding income and $1,512 annually.

Elizabeth testified that Debtors maintain a "very minimal standard of living". They do not go out for recreation, do not volunteer or have hobbies, and do not buy each other presents for Christmas because they cannot afford it. Their furniture is sparse, old and used. She testified that they have limited clothing, neither owns a winter coat, and their clothing budget goes to medical expenses unless their clothes completely wear out. They have no renters' insurance.

David testified that Elizabeth is developing cataracts and last got eyeglasses 6 years ago. Elizabeth testified that she uses trifocals and needs new glasses. She testified she has several cavities and no good teeth left with which to chew food. David testified that he and Elizabeth are both losing teeth and crowns because they have not visited a dentist since 2001 because they cannot afford it, and it is becoming difficult for them to eat solid food. Elizabeth takes a prescription drug for her own hypertension, which is provided from her doctor's samples because it is not covered by a drug plan.

Elizabeth's testimony regarding David's medical condition corroborated the serious symptoms reflected in his medical records, Plaintiff's Ex. 9. She testified that his left leg gives him trouble when he tries to stand on it for more than a few minutes, such as when he tries to cook. She testified that his chest pain has returned, and that in the last year he has told her on

---

[17]From $4.91 to $17.10.

occasion that he is not feeling well. Since his surgery, Elizabeth testified, David does not handle stress as well as before, and that in one particular instance she recalls that after receiving creditor calls at their mobile home, he had an attack of chest pains. She testified that he cannot multi-task like before. David testified that one of his main problems since the surgery is that he does not handle stress as well as he used to, but that in his own home and home office he is able to control stress fairly well. Defendant's Ex. 5, p. 65.

David testified that in order to pay the Defendant the $32,154.62 in student loan debt over 10 years with interest they would have to pay $267.96 per month. He testified that they cannot maintain a minimal standard of living and will be forced to live in poverty if forced to repay his student loans. David testified that he has not applied for an income contingent repayment plan, and that NCSEAA never suggested such a plan to him despite his request for relief. Defendant's Ex. 5, p. 76. David testified in his deposition that he only learned of income contingent repayment plans while doing research for this adversary proceeding, and he understands that he does not qualify because PLUS loans do not qualify for income contingent repayment plans. Defendant's Ex. 5, p. 76. This evidence is uncontroverted in the record.

David testified that because of his age he lacks the strength and stamina to relocate to another location where he could earn enough income to repay his student loans. When they moved to Montana, he testified, they had to hire help to load and unload their belongings. He testified that they also lack the money to relocate and retrain. David testified regarding his job search while they lived in Phoenix, where he could not get a single job interview in almost two years, from July 2001 to June 2003, despite answering classified ads and sending out resumes.

**Kleinkopf's Opinion Testimony**.

24

Kleinkopf has worked as a vocational expert since 1983. She testified that she mostly works with people with disabilities, but she was retained by NCSEAA to assess David's employability. She did not interview David, but testified that she sat in on his deposition and later reviewed the transcript, and reviewed his medical records. She testified that she reviewed David's verbal and writing skills, and she rated his verbal skills as excellent and his writing skills as consistent with his educational level, demonstrating sophistication.

Kleinkopf testified that age discrimination exists, but does not disqualify David from entering the labor market in Hamilton or Missoula. Kleinkopf explained that she has retrained people in their fifties, and that older workers generally have a positive reputation for showing up on time. Plaintiff's Ex. 12 sets forth a Congressional statement of findings that older workers are disadvantaged in efforts to retain and especially regain employment when displaced from jobs.

Kleinkopf's "Employability Assessment Report" for David was admitted into evidence as Defendant's Ex. 1, dated October 12, 2006. In her Report Kleinkopf noted that David is 65 years old, noted his medical assessment (including quadruple coronary artery bypass surgery, hypertension, hyperlipidemia and significant risk for prostate cancer), education and work history. When David moved to Hamilton in August of 2003, Kleinkopf wrote that his worklife expectancy was 5.7 years based upon the increment-decrement model of determining worklife expectancy (WLE), and 5.1 years using the conventional model. Defendant's Ex. 1, p. 9. Kleinkopf testified that now that David is 65 he has 4.3 years WLE based on the increment-decrement model, and 3.5 years using the conventional method. On cross examination, Kleinkopf testified that David's WLE would be 1.4 years based on the increment-decrement model if he is not active in the labor market, based on his age and education, but it would remain

25

3.5 years under the conventional method[18]. On redirect examination Kleinkopf testified that someone who is self employed in their own corporate business for a period of years is considered active.

Kleinkopf testified that nothing in David's medical records impacted his employability. Without interviewing him, and after listing more than a page of David's medical problems, based on the available medical records, Kleinkopf wrote in Defendant's Ex. 1, p. 4:

> Based upon the available medical records, there is no objective evidence of physician-assigned physical restrictions or limitations in Mr. Hamilton's ability to work. While no medical restrictions have been imposed, Mr. Hamilton identified stress as a problem he has experienced since his surgery, although he did not identify what, if any, impact upon his ability to work. In addition, he stated problems related to stair climbing that apparently causes angina-type pain.

Kleinkopf concluded in her Report that David's work skills qualify him for skilled occupations with sedentary or light physical demands such as loan officer, administrative assistant, bookkeeper, collection clerk, human resources assistant, social services aide, teacher aide, and bank teller, for which median hourly wages range from $8.93 to $18.21 in Missoula and from $6.15 to $11.71 in Hamilton. Defendant's Ex. 1, pp. 6, 9-10. Kleinkopf testified and Defendant's Ex. 1 reports that David is qualified for a number of such jobs in the Missoula and Hamilton area which she located on the Job Service's website.

Defendant's Ex. 1 concludes and Kleinkopf testified that David is employable and placeable in the above-listed categories of jobs. Kleinkopf testified that job openings exist in Missoula where David could find employment. David attempted in cross examination to challenge Kleinkopf's assumptions about his skills as a loan officer, teacher, and other positions,

_____

[18]She testified that there was no differentiation under the conventional method between active/inactive for a white male with a college degree.

but Kleinkopf testified that her conclusions were based on his deposition, reports and documents he had filed. Ex. 37 is a printout of a list of jobs from jobs.mt.gov dated 10/15/2006, including a listing for a daycare teacher and elder programs ombusdman. Kleinkopf testified that David was qualified for both jobs based on his background and experience.

David testified that his worklife ends, according to Kleinkopf's report, in less than 2 years and he could not pay off his student loans in that time because the monthly payments required over 2 years to repay $32,154.62 would total $1,339.78, which would exceed Debtors' combined social security income. David cited Defendant's Ex. 1, page 8, noting that any rehabilitation plan would require a full time diligent job search which would take time, and he testified that if he found a job which paid the $9.00 median hourly wage his monthly net after taxes would be $1,412.93, which would leave him $73.14 per month to live on after making the required monthly payment. Furthermore, if David had to go to work he testified that his expenses would increase for clothing and transportation. Finally, he testified that Debtors' corporations would be forced into bankruptcy without his attention if he were forced to work full-time, leaving Elizabeth liable for thousands of dollars in corporate debt owed to American Express and a computer lease because of Elizabeth's personal guarantee, and she is ineligible for further bankruptcy relief for 7 years.

## DISCUSSION

**A. Contentions of the Parties.**

David argues that excepting his student loan debt from his discharge would impose an undue hardship on him for the rest of his life. He contends that his age, illnesses and periods of unemployment prevented him from repaying his student loans in the past and future, and his

27

future income is limited to his social security retirement and inadequate to repay the student loans, the repayment periods of which he claims have expired. Debtors' social security income is barely above the poverty level, he argues, while their expenses exceed their income and are increasing. He contends they lack assets to sell to repay the student loans, including the corporate assets which if sold would impose liability on Elizabeth, and argue that the corporations are unlikely to increase their income or repay shareholder loans, although they show some potential. Debtors provided the U.S. Trustee and Trustee all information regarding the corporations, David argues, and they did not challenge any of his disclosures.

David argues that he has only 1.4 years remaining in his worklife, according to Kleinkopf, and that he was unsuccessful in previous job searches. He suffers from coronary heart disease, as shown by his medical records, which has returned, is worsening and is aggravated by stress. He contends that Kleinkopf made erroneous assumptions about his skills including, accounting, web design, and verbal and writing skills which he attributes to Elizabeth. Finally, David argues that he made good faith efforts to repay the student loans, even though he mistakenly believed he was only a co-signor, by making 34 payments voluntarily or by acquiescing to offset of his social security, totaling $2,367. He contends he kept in contact with NCSEAA by phone and letter and tried to negotiate a resolution.

NCSEAA argues that the corporate tax returns, Ex. 28 A and 28B, show that David failed to meet all 3 parts of the test for undue hardship from *In re Brunner*, 831 F.2d 395, 396 (2nd Cir. 1987). NCSEAA contends that the Debtors took $13,495.95 in "tax free" cash in loan repayments in 2005 from the corporations, which together with their social security income is enough to pay their minimal expenses and pay the NC PLUS educational loans. NCSEAA

28

argues that David failed to provide the more satisfactory evidence of the corporate payments for rent, vehicle and loan repayments, and that his failure to provide to relevant evidence should weigh against satisfying his burden of proof. NCSEAA complains of David's failure to list the corporate loan repayments , rent, vehicle payments, and corporate American Express debt on Debtors' bankruptcy schedules, or application for waiver of the Chapter 7 filing fee, and contends those show his lack of candor.

With respect to David's employability, NCSEAA cites Kleinkopf's testimony and report that David's skills make him employable within the normal labor market "that includes jobs for which he is qualified on the basis of his age, education and experience, and assumption of no medically assigned restrictions." NCSEAA contends that David has not tried to find employment, and prefers to use his "high level" skills working for his corporations. NCSEAA concedes that David made payments on his student loans, but argues that the applicable repayment period referred to in § 523(a)(8) means any repayment time available to the Debtor including the 25 year term under an income contingent repayment plan as discussed in *In re Hutchison*, 296 B.R. 819, 826, 22 Mont. B.R. 90 (Bankr. D. Mont. 2003). NCSEAA cites *In re Mason*, 464 F.3d 878, 885 (9th Cir. 2006), in which the Ninth Circuit reversed a finding of good faith efforts to repay, finding clear error because the debtor failed to take the bar exam a second time, failed to maximize his income by taking a second part-time job, and his efforts to negotiate repayment of his debt were inadequate because he could have attempted to renegotiate his debt under an income contingent repayment plan. NCSEAA argues that David failed to negotiate repayment in good faith, that his only offer failed to meet federal guidelines, and that Debtor failed to explain how he ran up an $11,000 tax debt from 1999. Finally NCSEAA accuses David

29

of lack of candor about the corporate cash flow, which it argues weighs against a finding of good faith effort to repay his debts and that his evidence should be viewed with distrust.

**B. § 523(a)(8).**

The discharge of student loan obligations is governed by 11 U.S.C. § 523(a)(8), which provides in relevant part after amendments made by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (Pub. L. 109-8) ("BAPCPA"), effective October 17, 2005:

> (a) A discharge under section 727, 1141, 1228(a) 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
>
>> (8) unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents, for –
>>
>>> (A)(i) an educational benefit overpayment or loan made,
>>>
>>>> insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>>>>
>>>> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>>>
>>> (B) any other educational loan that is a qualified educational loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual

The Bankruptcy Code does not define "undue hardship." Courts have held, however, that Congress intended the term to be interpreted strictly, and on a case-by-case basis. *Albert v. Ohio Student Loan Comm'n (In re Albert)*, 25 B.R. 98 (Bankr. N.D.Ohio 1982); *United States v. Brown (In re Brown)*, 18 B.R. 219 (Bankr. D. Kan. 1982); *Garmerian v. Rhode Island Higher Educ. Assistance Auth. (In re Garmerian)*, 81 B.R. 4 (Bankr. R.I. 1987). As the court in *Brown* noted:

> Mere financial adversity is insufficient, for that is the basis of all petitions in bankruptcy.

*Brown*, 18 B.R. at 222.  On the other hand, the Bankruptcy Code does not require that the debtor "live in abject poverty . . . before a student loan may be discharged."  *In re Mallinckrodt*, 260 B.R. 892, 900 (Bankr. S.D. Fla. 2001) (*quoting In re Faish*, 72 F.3d  298, 305 (3rd Cir. 1995)).

In a complaint to determine the dischargeability of student loan debt, a debtor has the burden of proof to show evidence of undue hardship sufficient to discharge the debt.  *Mason*, 464 F.3d at 881; *In re Rifino*, 245 F.3d 1083, 1087-88 (9th Cir. 2001); *In re Pederson*, 18 Mont. B.R. 429, 434 (Bankr. D. Mont. 2000), *In re Thomsen*, 17 Mont. 493, 499, 234 B.R. 506, 510 (Bankr. D. Mont. 1999).

Courts have identified several factors and tests to consider when determining whether "undue hardship" exists in a particular case.  *See Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir. 2003) (identifies the divergent body of authority, and then discusses the *Brunner* and the "totality of circumstances" tests).  The United States Court of Appeals for the Second Circuit established the *Brunner* test for determining "undue hardship" in the educational loan context.  *Brunner*, 831 F.2d at 396.  According to *Brunner*, in order to receive a discharge under 11 U.S.C. § 523(a)(8) a debtor must show:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.*  The Ninth Circuit Court of Appeals has adopted the *Brunner* test as the appropriate test for determining what constitutes undue hardship under 11 U.S.C. § 523(a)(8)(B).  *Mason*, 464 F.3d

at 881; *Nys v. Educational Credit Mgmt. Corp. (In re Nys)*, 446 F.3d 938, 941 n.1, 943 (9th Cir.

2006); *United Student Aid Funds v. Pena (In re Pena)*, 155 F.3d 1108, 1114 (9th Cir. 1998) ("We

adopt the *Brunner* test as the test to be applied to determine the 'undue hardship' required to

discharge student loans in bankruptcy pursuant to 11 U.S.C. § 523(a)(8)(B)"); *Rifino*, 245 F.3d

1083, 1087 (9th Cir. 2001). In *Pena*, the Court summarized the *Brunner* test as thus,

> First, the debtor must establish "that she cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans." *Brunner*, 831 F.2d at 396. The court noted that this portion of the test "comports with common sense" and had already "been applied frequently as the minimum necessary to establish 'undue hardship.' " *Id.* (citing *In re Bryant*, 72 B.R. 913, 915 (Bankr.E.D.Pa.1987)).

> Second, the debtor must show "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Brunner*, 831 F.2d at 396. This second prong is intended to effect "the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt." *Id.*

> The third prong requires "that the debtor has made good faith efforts to repay the loans . . . ." *Brunner*, 831 F.2d at 396. The "good-faith" requirement fulfills the purpose behind the adoption of section 523(a)(8). *Brunner*, 46 B.R. at 754-55. Section 523(a)(8) was a response to "a 'rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of education loan debts.' " *Id.*, (quoting the Report of the Commission on the Bankruptcy Laws of the United States, House Doc. No. 93-137, Pt. I, 93d Cong., 1st Sess. (1973) at 140 n. 14). This section was intended to "forestall students . . . from abusing the bankruptcy system." *Id.*

*Pena*, 155 F.3d at 1111; *Rifino*, 245 F.3d at 1088-89.

This Court, in *House v. Montana Deferred Student Loan Corp. (In re House)*, 17 Mont.

B.R. 321 (Bankr. D. Mont. 1999), followed the directive of the *Pena* Court by utilizing the three-

prong *Brunner* test, which test is also applicable in the instant case. *See also Gettle v. Sallie Mae*

*Servicing Corp. (In re Gettle)*, 19 Mont. B.R. 59, 257 B.R. 583 (Bankr. D. Mont. 2000); *Marsh v.*

*Moorehead College (In re Marsh)*, 19 Mont. B.R. 39, 257 B.R. 569 (Bankr. D. Mont. 2000);

*Hatfield v. William D. Ford Federal Direct Consolidation Program (In re Hatfield)*, 19 Mont.

B.R. 47, 257 B.R. 575 (Bankr. D. Mont. 2000); and *Hiltz v. U.S. Dept. of Education (In re Hiltz)*,

21 Mont. B.R. 417 (Bankr. D. Mont. 2003).  A debtor must prove all three elements identified in

*Brunner* before discharge can be granted on grounds of undue hardship.  *Mason*, 464 F.3d at 882;

*Rifino*, 245 F.3d at 1087-88.

**I.  First Prong**.

As set forth above, the *Brunner* test starts with an examination of whether the debtor can

maintain a minimal standard of living and still repay his student loan obligations.  *Mason*, 464

F.3d at 882; *Rifino*, 245 F.3d at 1088.  To satisfy the first prong, a debtor must demonstrate more

than simply tight finances.  *Rifino*, 245 F.3d at 1088; *In re Nascimento*, 241 B.R. 440, 445 (9th

Cir. BAP 1999).  In defining undue hardship, courts require more than temporary financial

adversity, but typically stop short of utter hopelessness."  *Id.*; *see In re Faish*, 72 F.3d at 305

("[T]he Bankruptcy Code does not require that the debtor "live in abject poverty . . . before a

student loan may be discharged.").

The Court concludes, based upon the evidence, that David easily has satisfied the first

*Brunner* prong.  The Debtor's Schedules and testimony regarding updated expenses show that

their combined social security income totals $1,306 per month, while their current expenses total

$1,432, a monthly deficit of $126 leaving nothing for repayment of the 3 NC PLUS loans.

Addressing NCSEAA's contention that David demonstrated lack of candor, the Court notes that

it observed David's and Elizabeth's demeanors while each testified under oath, and while David

33

was cross examined[19]. The Court finds that both David and Elizabeth are credible witnesses. *In re Taylor*, 514 F.2d 1370, 1373-74 (9th Cir. 1975); *See also Casey v. Kasal*, 223 B.R. 879, 886 (E.D. Pa. 1998).

NCSEAA contends that David made numerous mistakes in his Schedules, application for waiver of filing fee, and corporate tax returns which show his lack of candor and that he sheltered income in the Debtor's corporations. However, NCSEAA did not offer any expert testimony from a tax accountant or other qualified professional which establishes that David made mistakes in his tax returns. NCSEAA's attorney's argument is not evidence. *Hurley v. Student Loan Acquisition Auth. of Ariz., et al.*, (*In re Hurley*), 258 B.R. 15, 23, 19 Mont. B.R. 73 83 (Bankr. D. Mont. 2001); *United States v. Velarde-Gomez*, 224 F.3d 1062, 1073 (9th Cir. 2000). The Court is mindful that David is a pro se Debtor, and courts have a duty to construe pro se pleadings liberally, including pro se motions. *Bernhardt v. Los Angeles County*, 339 F.3d 920, 925 (9th Cir. 2003). The Court agrees with David that the docket in Case No. 06-60161-7 does not reflect any enforcement action by the Trustee or U.S. Trustee based upon his preparation of the Schedules or his corporate tax returns, and this adversary proceeding is limited to issues involving undue hardship under § 523(a)(8). Without any expert testimony from NCSEAA regarding David's preparation of tax returns and Schedules, the Court will not infer lack of candor or any other unfavorable presumption based upon David's alleged mistakes.

Next, the Court rejects NCSEAA's urge for a presumption of evidence unfavorable to David based upon his undisclosed 1999 tax returns which resulted in an IRS debt of $11,000 which was offset against his social security benefits. The docket in this adversary proceeding

---

[19]NCSEAA did not cross examine Elizabeth, so her testimony was uncontroverted.

shows that Dye requested and ultimately won production of the corporate tax returns, but nothing in the record shows that Dye requested production of any other tax returns from David. NCSEAA did not file a motion to compel production of any other tax returns, and therefore the Court considers NCSEAA's contention based upon the IRS debt a red herring which is not entitled to any presumption.

David and Elizabeth have high hopes for their corporations' success, and both work long and hard trying to achieve their success, but the evidence set forth above shows that the Quiet Impact character publishing business, what little there was, has stopped developing. David's work on Bottom Line Impact in record keeping has but one client, a former employer. His internet marketing business has not succeeded, despite his best efforts, and his prospects at self-education to develop the internet marketing business do not look good. In sum, no evidence exists in the record that the corporations are sheltering income which could make up the Debtors' monthly $126 deficit and pay David's three NC PLUS loans of $32,154.62.

No evidence exists in the record that Debtors or their two corporations have assets which could be sold to pay the NC PLUS loans. Debtors' personal possessions except for their 2001 Nissan Sentra have no value, and selling their car would necessarily require an increase in transportation expense and monthly deficit. The corporate assets consist of only furniture and a computer lease, and liquidating the corporation would expose Elizabeth to American Express corporate liability which she could not discharge, which this Court considers an undue hardship on the Debtors.

The Court does not consider its reasoning in *Hutchison* as support for NCSEAA's argument that David failed to apply for an income contingent repayment plan. In *Hutchison* this

Court noted in its discussion of the first prong that the debtor did not know anything about income repayment plans under the William D. Ford Program and had not considered it. 296 B.R. at 826[20]. That discussion followed the Court's conclusion that debtors failed to satisfy the first prong because the debtors were paying more for daycare than the monthly payment on student loans, while the husband was unemployed. 296 B.R. at 825-26. The instant case is factually distinguishable from *Hutchison* in several key respects.

First, David is retired rather than employed like Mrs. Hutchison. The Ninth Circuit made clear in *Mason* that it has not imposed a requirement to satisfy the first prong of *Brunner* that a debtor prove that he has maximized his income. *Mason*, 464 F.3d at 882 & n.3 (discussing *Nascimento*, 241 B.R. at 444-45). Therefore David's employability is reserved for the discussion of the second and third *Brunner* prongs below. Second, David and Elizabeth have a monthly deficit, and no expenses which could be cut or eliminated like the daycare and entertainment expenses in *Hutchison*. 296 B.R. at 825. Third, NCSEAA's own evidence, contained in Defendant's Ex. 5, David's deposition, at page 76, which was admitted into evidence by stipulation, is the only evidence in the record and thus establishes the fact that David does not qualify for an income contingent repayment plan because PLUS loans do not qualify for income contingent repayment plans[21]. Defendant's Ex. 5, p. 76.

The first prong of the *Brunner* test requires that the debtors show they cannot repay their

_____

[20]The income contingent repayment plan was provided at 34 C.F.R. § 685.209. *Hutchison*, 296 B.R. at 826.

[21]No evidence to the contrary, the Court accepts NCSEAA's evidence and finds that David's PLUS loans do not qualify for an income contingent repayment plan. In the event NCSEAA ultimately prevails in this adversary proceeding on this point, then it must follow that David would qualify for an income contingent repayment plan.

36

student loans and maintain a minimal standard of living. *Mason*, 464 F.3d at 882; *Pena*, 155 F.3d at 1111. This prong "comports with common sense". *Pena*, 155 F.3d at 1111; *Brunner*, 831 F.2d at 396; *In re Pederson*, 18 Mont. B.R. at 438 . Applying this common sense standard to the evidence, the Court in its discretion concludes that David cannot maintain a minimal standard of living and still make payments on his NC PLUS student loan obligations. Any increase in social security or income from their corporations, however unlikely, would first need to make up the $126 monthly deficit, and then in this Court's view David should be able to address his and Elizabeth's woeful dental conditions before being required to repay his NC PLUS loans. The evidence shows that David cannot maintain a minimal standard of living, thus making payments on his NC PLUS impossible. Requiring payment of $32,154.62 in student loans would push the Debtors into poverty. Common sense dictates that David has overwhelmingly satisfied the first prong of *Brunner*.

**II. Second Prong**.

To satisfy the second prong of the *Brunner* test, debtors must prove that their state of affairs is likely to persist. *Mason*, 464 F.3d at 882. The Ninth Circuit Court of Appeals explains that the second prong "is intended to effect 'the clear congressional intent exhibited in section 523(a)(8) to make the discharge of student loans more difficult than that of other nonexcepted debt.'" *Rifino*, 245 F.3d at 1088-89. Courts which have examined the second prong of the *Brunner* test focus on whether a debtor's present financial condition is temporary, or whether the condition will exist for a significant period of time. *In re Pena*, 155 F.3d at 1113 (Granting a discharge of the debtors' student loans where one of the debtor's was declared permanently mentally disabled and incapable of holding a job for more that six months to a year.); *Matter of*

37

*Roberson*, 999 F.2d 1132, 1137 (7th Cir. 1993) (Discharge of student loans was denied where the debtor's current impediments to employment, including lack of transportation and wrist and back injuries, would not preclude gainful employment in the future.); *In re Brunner*, 46 B.R. 757 (The debtor, who claimed to suffer from anxiety and depression, was denied a discharge of her student loans where the evidence was "too thin to support a finding that her chances of finding any work at all [were] slim".).  The following analysis in *Nys v. Educational Credit Mgmt. Corp. (In re Nys)*, 308 B.R. 436, 446-47 (9th Cir. BAP 2004), applies in this case:

> In sum, we conclude that "additional circumstances" under the second prong of the *Brunner* test must be indicia of a debtor's inability to repay the loan in the future. Such circumstances need not be "exceptional," except in the sense that they are tenacious and demonstrate insurmountable barriers to the debtor's financial recovery and ability to pay for a significant portion of the repayment period. This approach gives the courts the appropriate flexibility to do justice in each unique case.
>
> Based on the prior case law and this case, "additional circumstances" may include the following nonexhaustive list of factors:
>
> 1. Serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement; *Brunner*, 831 F.2d at 396;
>
> 2. The debtor's obligations to care for dependents; *Id.*;
>
> 3. Lack of, or severely limited education; *Pena*, 155 F.3d at 1114;
>
> 4. Poor quality of education;  [note omitted]
>
> 5. Lack of usable or marketable job skills; *Birrane*, 287 B.R. at 497;
>
> 6. Underemployment;  [note omitted]
>
> 7. Maximized income potential in the chosen educational field, and no other more lucrative job skills;
>
> 8. Limited number of years remaining in work life to allow payment of the

38

loan; *Brunner*, 831 F.2d at 396;

      9. Age or other factors that prevent retraining or relocation as a means for payment of the loan;

      10. Lack of assets, whether or not exempt, which could be used to pay the loan;

      11. Potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income;

      12. Lack of better financial options elsewhere.

The BAP's analysis and result was affirmed by the Ninth Circuit in *Nys*, 446 F.3d at 946-47, with

the further explanation:

> However, although the trial court should look to "additional circumstances" to make this finding, the determinative question is whether the debtor's inability to pay will, given all we know about the salient features of her existence, persist throughout a substantial portion of the loan's repayment period.

* * * *

> Undue hardship requires only a showing that the debtor will not be able to maintain a minimal standard of living now and in the future if forced to repay her student loans. We will presume that the debtor's income will increase to a point where she can make payments and maintain a minimal standard of living; however, the debtor may rebut that presumption with "additional circumstances indicating that her income cannot reasonably be expected to increase and that her inability to make payments will likely persist throughout a substantial portion of the loan's repayment period.

*Nys*, 446 F.3d at 946.

      David has shown a number of the above-listed factors by a preponderance of the evidence

which successfully rebuts the presumption that his income will increase to a point where he can

make payments and maintain a minimal standard of living. First, David's medical records, and

his and Elizabeth's testimony, show beyond any reasonable doubt that David suffers serious

39

physical disability which prevents his employment or advancement. NCSEAA did not object to the admission of David's medical records, Plaintiff's Ex. 9. They are extensive and reflect, among other things, his quadruple bypass surgery, high blood pressure, stress related numbness, suspected diverticulitis, chest tightness when under stress, hypertension which is inadequately controlled, "progressive effort angina" which occurs frequently in settings of emotional stress or walking up stairs, continued mild high blood pressure, hyperlipidemia, numbness in his left side and left leg while standing, "at significant risk for prostate cancer", and finally Dr. Wilson's impression on 6/15/2006 regarding David's coronary artery disease and progressive angina: "New disease or graft failure suspect." Plaintiff's Ex. 9. Remarkably Kleinkopf, without interviewing David, concluded after reviewing the above that "there is no objective evidence of physician-assigned physical restrictions or limitations in Mr. Hamilton's ability to work." Defendant's Ex. 1, p. 4. What Kleinkopf failed to realize is that David has been retired since 2003, before the above observations by David's doctors in 2006, so there would be no reason for the examining physician to consider whether he should assign physical restrictions or limitations in ability to work for a retired patient. Kleinkopf engaged in overreaching in assuming that David has no physical restrictions or limitations in his ability to work based on examinations while he was retired.

The determination of the weight to be given expert testimony or evidence is a matter within the discretion of the trier of fact – which in a bench trial like the instant is the bankruptcy court. *Hurley*, 258 B.R. at 24, 19 Mont. B.R. at 86; *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990); *Arkwright Mutual Insurance Co. v. Gwinner Oil Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997); Barry Russell, *Bankruptcy Evidence Manual*, 2000 Ed., § 702.2. Kleinkopf is not a

medical doctor, and thus her opinion and interpretation of David's medical records to conclude that she saw nothing that would prevent his employment, ignores the black and white medical conclusions that he suffers from new coronary disease with suspect graft failure, and progressive effort angina or chest tightness in settings of emotional stress. This Court assigns little probative weight to Kleinkopf's expert testimony because she did not adequately consider his physical restrictions or limitations in his ability to work based on his medical problems diagnosed during his retirement.

Furthermore, NCSEAA had the right to request that Debtor submit to a physical examination of David under FED. R. CIV. P. 35(a) (applicable in adversary proceedings under F.R.B.P. Rule 7035) in order to determine whether his medical problems create physical restrictions or limitations in his ability to work. Having failed to avail itself to its right to a physical examination of David under the rules, the Court assigns little probative weight to Kleinkopf's opinion and NCSEAA will not be heard to complain that the evidence does not show physical restrictions or limitations in David's ability to work. *Hurley*, 258 B.R. at 24-25, 19 Mont. B.R. at 87. Plaintiff's Ex. 9, together with David's and Elizabeth's testimony, comprise substantial credible evidence that David suffers from serious medical problems which limit his ability to work.

NCSEAA argues that David is capable of prolonged concentrated effort in working on the corporations. The distinction between self-employment at a wholly-owned corporation and the regular workforce is plain to see – while working in his home office on his corporations David is free to stop working when he feels the need to rest, an option not available to most in the workforce.

The Ninth Circuit wrote in *Nys* "that neither *Brunner* nor *Pena* imposes a requirement that additional circumstances be 'exceptional' in the sense that the debtor must prove a 'serious illness, psychiatric problems, disability of a depend[e]nt, or *something* which makes the debtor's circumstances more compelling than that of an ordinary person in debt." 446 F.3d at 946, quoting *Nys*, 308 B.R. at 444. David's medical records show additional circumstances of serious illness which satisfies the *Nys* standard.

David is 65 and already retired, as is Elizabeth. Kleinkopf testified that David has, at most, 4.3 years of work life, although her opinion suffers from a failure to appreciate the seriousness of David's coronary disease and other conditions. Whether the Court looks at the fact David is already retired, or Kleinkopf's estimate that he has at most 4.3 years remaining in his work life, either way this *Nys* factor weighs in David's favor because it is a limited number. At the maximum 4.3 years remaining in his work life, in order for David to repay $32,154.62 in that period, without including accruing interest, David would need to earn enough to make monthly payments for almost 52 months in the amount of $618.36. NCSEAA did not offer any evidence showing what wage David would need to earn to have that amount left over after paying his living expenses, and the evidence in the record shows that the likelihood of David's earning that much income over his expenses if forced to return to work is low, notwithstanding Debtors' hope for their corporations' success.

Although courts in the Ninth Circuit have stated that a "[debtor's] age does not constitute an 'additional circumstance,' especially when she is healthy and does not affect her ability to work[,]" (*Educational Credit Management Corp. v. Degroot*, 339 B.R. 201, 212 (D. Or. 2006), quoting *Chapelle v. Educ. Credit Mgmt. Corp. (In re Chapelle)*, 328 B.R. 565, 572 (Bankr. C.D.

42

Cal. 2005)), such cases predate the Ninth Circuit ruling in *Nys*, which dispels any notion that age may not be an additional circumstance. In the instant case the evidence overwhelmingly shows that David is not healthy but rather seriously ill, and his age affects his ability to work.

The court in *Degroot* agreed with the "general consensus . . . that where debtors choose to incur educational debt later in life, the fact that they will reach retirement age during the loan repayment period is not alone enough to justify discharge under § 523(a)(8)." *Degroot*, 339 B.R. at 212-13. Again however, the instant case is distinguishable because David incurred student loan debt, for his children not himself, in the 1980s and early 1990's. Thus while David's retirement age during any prospective loan repayment period may not alone be enough to justify discharge, the district court in *Degroot* recognized: "Of course, that is not to say that age is never properly considered as an additional circumstance causing undue hardship" 339 B.R. at 213, citing *Brunner*, 831 F.2d at 396 (finding no "additional circumstance" exist where debtor "is not disabled, *nor elderly*") (emphasis added). The evidence shows that David is both elderly and has serious health problems.

Other cases finding that age does not constitute an additional circumstance are distinguishable on the facts, or recognize that illness would change the result. The debtor in *Educational Credit Management Corp. v. Spence*, 341 B.R. 825, 828-829 (E.D. Va. 2006) found a debtor's age did not constitute an additional circumstance, "especially where she does not have any 'age-related illnesses that affect her ability to work.'" (quoting *Chapelle*, 328 B.R. at 572). Ms. Spence was 65 years old, currently employed, in good health, with an excellent educational background including a Ph.D, who planned to work for fifteen or twenty more years. *Spence*, 341 B.R. at 827, 828. She had incurred $161,000 in student loan debt and did not make a single

43

payment, and had been out of school only five years.  *Id.* at 828-29.  Other than being 65 years

old, the evidence shows David's circumstances in the instant case far different:  Poor health,

unemployed in the workforce, with dated education and limited professional development, and

currently retired.

     *Geyer v. U.S. Dept. of Ed. (In re Geyer)*, 344 B.R. 129, 132-133 (S.D. Cal. 2006),

predates *Nys* and involved a 63 year old student loan debtor where the court affirmed summary

judgment that debtors failed to show absence of genuine issue of material fact regarding undue

hardship.  As in *Spence*, however, the student loan debtor in *Geyer* was in good health, unlike

David[22].  *Id*.  Given the evidence of David's poor health and its affect on his ability to work,

which are exceptions recognized by *Degroot, Chapelle, Spence,* and *Brunner*, this Court finds

that David's age is an additional circumstance indicating that his income cannot reasonably be

expected to increase and that his inability to make payments will likely persist throughout a

substantial portion of the loan's repayment period, and rebuts the presumption that his income

will increase to a point where he can make payments and maintain a minimal standard of living.

*Nys*, 446 F.3d at 946.

     Additional distinguishable evidence in the instant record involves age discrimination.

The courts in *Geyer* and *Degroot* rejected debtors' arguments that age discrimination was an

additional factor in their inability to increase their income through employment.  *Degroot*, 339

B.R. at 213 ("Even if I were to agree with this proposition, such a finding must be based on facts

---

     [22]Mrs. Geyer also had no current monthly payments due on her student loans because she had consolidated them and elected to repay under the Income Contingent Repayment Plan, which set the payments based on the borrower's income, and based on her income her payment was zero.  The repayment period under the Plan was 25 years.  *Geyer*, 344 B.R. at 133.

relevant to the particular debtor involved. This is not a general principal of which I can simply take judicial notice. . . . [T]o the extent the bankruptcy court based its decision on its general understanding of how older workers fare in the employment market, I find error."); *Geyer*, 344 B.R. at 133 ("Debtors claim they cannot secure better employment due to age discrimination. The record does not support this claim."). In the instant case, by contrast, NCSEAA's own expert testified in direct examination, when asked whether David's age disqualifies him, that discrimination exists. Congressional findings in Plaintiff's Ex. 12 corroborate its existence. Kleinkopf explained that means exist to enter the labor market in spite of age discrimination, with retraining and a dedicated job search, because of qualities of older workers such as punctuality. Thus NCSEAA's own expert established that age discrimination exists, corroborated by Congressional findings admitted into evidence without objection. David's health problems constitute facts relevant to the particular Debtor which support his claim that he cannot secure better employment. If age discrimination exists, and the uncontroverted testimony from an employment expert and Congress establishes that it exists, the effect of David's coronary artery disease, angina, chest pains and numbness during times of stress can only exacerbate the effect of age discrimination on his employability if a potential employer learns of them.

Still more additional *Nys* factors are shown by Debtors' testimony that they lack assets which could be sold to repay the NC PLUS student loans. 446 F.3d at 947. Their clothes, furniture and personal possessions are exempt and not worth enough to begin to pay David's PLUS loans. Likewise the assets of their two corporations are minimal and cannot be sold without undue hardship to Elizabeth. David's potentially increasing medical expenses outweigh any potential appreciation in the value of the Debtors' assets and/or likely increases in their

45

income. *Nys,* 446 F.3d at 947. Finally, Debtors lack better financial options elsewhere and lack the means to move elsewhere. *Id.* The Court can only conclude that the additional circumstances impacting David's current state of affairs are likely to persist for a significant portion of the repayment period of his student loans. *Id.*; *Mason*, 464 F.3d at 882.

**III. Third Prong.**

The third *Brunner* prong requires that the debtor exhibit good faith efforts to repay the student loans. *Mason*, 464 F.3d at 884; *Pena*, 155 F.3d at 1111; *Rifino*, 245 F.3d at 1087. Good faith is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses. *Mason*, 464 F.3d at 884, quoting *In re Birrane*, 287 B.R. 490, 499 (9th Cir. BAP 2002). A history of making payments or not is, by itself, not dispositive. *Mason*, 464 F.3d at 884, citing *In re Birrane*, 287 B.R. 490, 499-500 (9th Cir. BAP 2002). But making payments on student loan obligations, even garnishment with debtor's consent, demonstrate good faith. *See Hallberg v. Montana Guaranteed Student Loan Program*, 19 Mont. B.R. 416, 433 (Bankr. D. Mont. 2002).

Plaintiff's Ex. 21 and 22 show that David made voluntary payments on his NC PLUS loans totaling $2,367.00, both voluntarily and acquiescing to offset against his social security. The evidence shows that David has minimized his expenses, and shown that he has maximized his income in his retirement and his dedicated efforts to make his corporations successful despite his health problems.

NCSEAA cites *Mason* in which the Ninth Circuit reversed a finding of good faith efforts to repay and found clear error because the debtor failed to take the bar exam a second time, failed to maximize his income by taking a second part-time job, and his efforts to negotiate repayment

06-00076-RBK   Doc#: 83   Filed: 03/05/07   Page 46 of 49

of his debt were inadequate because he could have attempted to renegotiate his debt under an income contingent repayment plan. 464 F.3d at 885. *Mason* is distinguishable on several facts. The evidence in the instant case shows that David sought employment on several continents in several fields. His last job search in Phoenix was diligent and extended, but ultimately unsuccessful. David minimized his expenses and made adequate efforts to obtain full-time employment, before requesting and qualifying for early retirement as allowed under federal law.

In this adversary proceeding NCSEAA raised the possibility of an income contingent repayment plan in opposing dischargeability of David's NC PLUS loans, but NCSEAA did not demonstrate good faith to David by giving him that option when he was negotiating a settlement and requesting consideration in 2003 based on hardship. The student loan creditor North Carolina State Education Assistance Authority, Guaranty Agency Services, cited federal guidelines in Plaintiff's Ex. 29 refusing David's offer of compromise, but did not mention or offer an income contingent repayment plan to David despite his request for help. In any event, NCSEAA's own uncontroverted evidence, in Defendant's Ex. 5 from David's deposition, page 76, is that David does not qualify for an income contingent repayment plan because PLUS loans do not qualify for income contingent repayment plans. Without any evidence to the contrary, David's failure to seek an income contingent repayment plan under the William D. Ford Program for which he does qualify cannot be evidence of lack of good faith.

It is not necessary that a debtor or a debtor's dependent suffer from a debilitating medical condition in order to meet the extenuating circumstance requirement, and in rare cases a debtor's severe financial situation and lack of other resources may be grounds, in and of itself, to meet the requirements of § 523(a)(8). *Hallberg*, 19 Mont. B.R. at 435. In the instant case David has

47

shown by a preponderance of the evidence that he suffers from a debilitating medical condition, severe financial situation and a lack of other resources. Based on David's record of payments on his student loans, offers to compromise, efforts to obtain employment, maximize income and minimize expenses, the Court concludes that David has satisfied the third prong of the *Brunner* test by a preponderance of the evidence. *Mason*, 464 F.3d at 884; *Pena*, 155 F.3d at 1114.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2. This is a core proceeding to determine the dischargeability of educational loans under 28 U.S.C. § 157(b)(2)(I) and 11 U.S.C. § 523(a)(8).

3. David has satisfied his burden of proof under § 523(a)(8) by a preponderance of the evidence. In particular, David has satisfied the three prongs of the test set forth in *Brunner*, 831 F.2d at 396, *Mason*, 464 F.3d at 882, and *Pena*, 155 F.3d at 1114, by showing that he cannot maintain, based on current income and expenses, a minimal standard of living for himself and repay his NC PLUS student loans. In addition, David has shown additional circumstances exist indicating that this current state of affairs is likely to persist into the future; and David has shown that he has made a good faith effort to repay the student loans, obtain employment, maximize income, and minimize expenses.

4. David has shown by a preponderance of the evidence that excepting his three PLUS student loan debts from his discharge would impose on the Debtor an undue hardship.

**IT IS ORDERED** a separate Judgment shall be entered in this adversary proceeding in favor of the Debtor/Plaintiff David Hamilton and against the Defendant North Carolina State

Educational Assistance Authority, providing that Plaintiff's three educational NC PLUS loans owed to the Defendant North Carolina State Educational Assistance Authority, in the approximate amount of $32,154.62 together with all accruing interest, fees, and costs as provided in the NC PLUS loan documents in evidence, are dischargeable and discharged pursuant to 11 U.S.C. § 523(a)(8).

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

49